## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANTHONY MANN, DANA MOYE, & KATINA MCGEE,

        Plaintiffs,

        v.

XPO LOGISTICS FREIGHT, INC., f/k/a CON-WAY TRANSPORTATION SERVICES, INC., f/k/a CON-WAY FREIGHT INC.,

        Defendant.

Case No. 16-2196-CM

## MEMORANDUM AND ORDER

Plaintiffs Anthony Mann, Dana Moye, and Katina McGee filed the present action against their former employer, defendant XPO Logistics Freight, Inc., for employment discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). The matter is now before the court on defendant's Motion for Summary Judgment (Doc. 202). For the reasons set forth below, the court grants defendant's motion.

### I.      Background

Defendant is a corporation that provides transportation and logistics services throughout the United States. Plaintiffs were employed by defendant as Driver Sales Representatives ("DSRs") at the Kansas City, Kansas facility. DSRs have a multitude of job duties including driving defendant's vehicles to transport customer freight or working on the dock loading and unloading freight. DSRs are required to maintain a Commercial Drivers License ("CDL") and must have "prompt, daily attendance at assigned work location[s]." Some DSRs perform "line haul" duties, which involve transportation of freight from Kansas City to one of defendant's other facilities, and then a same-day return trip back to Kansas City. If freight needs to be transported over longer distances, DSRs may drive on Extended Service Lines

("ESLs").  Federal regulations require that ESLs involve a two-DSR team so that one driver can sleep in a sleeper cab while the other drives.  DSRs also may do local pick up and delivery around the Kansas City area or perform dock duties such as unloading and loading freight, clearing the dock, and "hostling," which is moving trailers around the yard and dock bays.

DSRs report to Freight Operations Supervisors, who in turn report to Freight Operations Managers.  All managers and supervisors ultimately report to a Service Center Manager.  At times relevant to this litigation, the Service Center Manager was Mike Lewis.  Defendant also utilizes a Personnel Supervisor who handles administrative duties such as payroll, employee attendance, time-off requests and the Job Selection Preference process.  During the relevant times to this litigation, Anita Sloan was the Personnel Supervisor.

Human resource matters are handled first by a Human Resources Generalist—here, Maureen Mahr—who reports to a Human Resource Director—here, Kevin Huner.  All employee termination decisions are made by the Human Resource Directors, using recommendations made by the Human Resource Generalist.

Every year, defendant allows its DSRs to register their preferences for work assignments through a Job Selection Process or "bid process."  The Personnel Supervisor collects bid sheets from DSRs who numerically rank their preference for work category (such as line haul, ESL, or local pick up and delivery) and preference for various runs listed within each category.  Employees with more seniority get priority when it comes to preference selections.  The bid process, however, is only a preference list; it is not a guarantee of what tasks a DSR may be assigned on a given day.  DSRs are compensated based on an established structure of rates.  When driving, a DSR is paid on a per-mile rate.  This rate is pre-set depending on how long the DSR has been employed by defendant.  For other work, including local

deliveries and dock work, a DSR is paid a set hourly rate which is also determined based on how long the DSR has been employed by defendant.

*Anthony Mann*

Mann, an African-American male, was employed by defendant from August 24, 2009, until he was terminated on June 15, 2015. Mann was a DSR, and at the time his employment ended, his main role was to perform the "hostler" function, which included moving trailers throughout the yard and hooking containers to trailers. On May 9, 2015, another employee made a complaint alleging Mann was making comments to other workers about using race as a form of job protection. On May 14, 2015, Mann mis-hooked a trailer, which caused property damage. And on May 18, 2015, the Director of Operations, Mike Potter, observed Mann using his personal cell phone while he was working, which was a violation of company policy. Potter informed the Assistant Service Center Manager, Bryan Bonifas, that he observed Mann on his cell phone. Bonifas called Mann into a meeting to discuss the matter with Maureen Mahr. While Bonifas and Mahr were discussing the cell phone policy violation with him, Mann proceeded to answer his phone, which Bonifas considered a "disruption during the investigation and further display of failing to adhere to the cell phone policy." (Doc. 202-2, at 69.)

On May 28, 2015, Mahr met with Mann to discipline him for the mis-hook incident and to issue discipline for the cell phone policy violations. Mahr also wanted to obtain a statement from Mann regarding the employee complaint made against him. During the meeting, Mann again interrupted the discussion by answering his cell phone. Mann told Mahr he could not make a statement regarding the complaint because he needed to leave immediately to meet someone about a moving van. He claimed he had permission to leave work early, but it was later determined that he had not properly sought the time off pursuant to time-off policies.

On May 29, 2015, Mann arrived at work to write a statement in response to the employee complaint. He was then placed out of service for violation of Policy 541 and insubordination due to his "blatant disregard toward the cell phone policy" and insubordination toward Mahr and Bonifas. Mann's response to the complaint included his own allegations of race discrimination. In response to these allegations, defendant began a three-day investigation, utilizing three Human Resource Generalists from outside Kansas City. The investigators allegedly interviewed 128 employees and concluded that

> many employees hold a perception that there is favoritism with whatever group they are **not** a part of. Caucasians perceive that African Americans and Hispanics receive favoritism, African Americans perceive that Caucasians and Hispanics receive favoritism, high performers perceive that lower performers are given a break while lower performers feel that they are picked on and higher performers get away with things.

(Doc 217, at 1.) Human Resources Director Kevin Huner believed that this indicated there were issues with consistently applying policies. He concluded, however, that the allegations made by Mann were "found to be largely without merit," and that it was clearly established that Mann "uses his race to get his way in specific situations and has bragged about it to others causing a disruption in the workplace." (*Id*.) Huner scheduled training for leaders and supervisors to address the consistency issues, harassment, and discrimination.

Mann was placed out of service during the investigation. On June 8, 2015, Huner emailed the Vice President of Human Resources, Bruce Moss, recommending that Mann be terminated for insubordination due to his "complete disregard or respect for instructions given to him," and based on a "massive amount of documentation" that showed that Mann, over a long period of time, "manipulated people to get his way through using race as an issue and violated policy . . . ." (Doc. 202-2, at 89.) Moss disagreed with Huner's termination recommendation and suggested instead that Mann be disciplined for his performance but be brought back to work.

On June 9, 2015, Huner and Service Center Manager Mike Lewis called Mann to inform him that he could return to work and instructed him to return the following day. Mann informed them that he was on a previously scheduled vacation and would not be able to return to work until June 15. Huner initially accepted Mann's representation that he had previously scheduled vacation, but upon further investigation discovered that he had not obtained proper approval to take time off. Mann claims that he had selected the dates before-hand and that he goes out of town that week every year. There is evidence, however, that he had not taken time off that week in either 2013 or 2014.

On June 11, 2015, Huner left a message with Mann informing him he did not have approval for time off work and instructing him to report to work on June 12. When Mann did not report to work on June 12, Huner reported the developments to Moss, who advised him that this additional misconduct, when viewed collectively with previous misconduct, was reason to terminate Mann. Mann was terminated on June 15, 2015.

Mann admits that he was never personally subjected to any racially derogatory statements during his employment, but claims he was offended when he witnessed racially derogatory statements made to other black employees. He claims in 2013 or 2014 an employee told a black supervisor, "I'll whip your ass, boy." He also claims that in 2013 or 2014 he saw something like "KKK" written on his locker, that he reported it, and that it was cleaned up. Mann also claims that sometime in 2014 he would hear monkey noises over the radio while he was working, but when he reported it, his supervisors and Mahr told him it was just employees kidding around.

*Dana Moye*

Moye, an African-American male, was employed by defendant from September 1997 until he was terminated on April 8, 2016. Moye was a DSR, and during 2016 was doing long haul runs. On January 6, 2016, Moye was on a long haul run when he was contacted by central dispatch to turn back

to meet the wife of a DSR so she could retrieve the keys the DSR had accidentally left in the truck. Moye turned in his pay sheet for that trip to be approved by Service Center Manager Mike Lewis. Lewis reviewed Moye's pay sheet and mileage book and found multiple discrepancies in his records, including a request to be compensated both in time and mileage for the turnaround. Moye was placed out of service for approximately one hour while the matter was investigated. Mahr determined that Moye may have received certain instructions from other employees about how to report the time for the turnaround, and his pay was adjusted so that he was not double dipping on pay. Because of other discrepancies in the report, Mahr issued Moye a "Letter of Instruction," which reprimanded Moye for the multiple inconsistencies in his report.

A DSR is required to hold a valid CDL, and defendant is required to comply with federal Department of Transportation regulations regarding the employment of drivers working under a CDL. Company policy requires that every employee holding a CDL must report any traffic citations (other than parking violations) to his supervisor before the end of the next business day following the day of conviction. According to the policy, failure to comply will result "in disciplinary action up to and including termination of employment." (Doc. 217-9.) And an employee is required to report any suspension, revocations, or cancellations to their CDL by the end of the business day following the day the employee received notice, or face "disciplinary action up to and including termination of employment." (*Id.*) Additionally, Personnel Supervisor, Anita Sloan, is responsible for administering an annual motor vehicle record review of its DSRs. During the annual review process, Sloan distributes a form to DSRs to self-report any issues with their CDL (other than parking tickets) for the year leading up to the completion of the form. Sloan then obtains a motor vehicle record report to confirm the DSR's driving history and compares it with the driver's self-report to determine whether the employee made an accurate self-report.

On January 20, 2015, Moye's CDL was suspended by the State of Missouri. Moye continued to drive defendant's trucks during the 14-day period his CDL was suspended. It was reinstated on February 5, 2015. Moye failed to notify defendant of the suspension as required by policy. Moye also failed to self-report the suspension on his annual motor vehicle record review. According to Mahr, Moye was placed out of service on April 5, 2016, pending an investigation. When she confronted Moye about the suspended license, she claimed Moye was "less than honest during the course of questioning with HR regarding the matter," and that he had a variety of inconsistent and insufficient explanations for his conduct. (Doc. 202-2, at 135.) Mahr recommended terminating Moye based on failure to adhere to Policy 541 for falsification of documents. Kevin Huner concurred with the recommendation, and Moye was terminated on April 8, 2016 for driving company vehicles on a suspended license and for not reporting the suspension. Moye, however, contested the termination, claiming he forgot about a ticket he received in January 2015 when completing his annual review, that he did not know he had a suspended license, and that he was unaware he was falsifying documents.

Moye also claimed he was subject to both age and race harassment throughout his employment. Specifically, Moye claims he witnessed racist graffiti "on a monthly basis," including graffiti that stated, "a good n***er is a dead n***er" and other derogatory comments. He admitted he and other African American DSRs would report the graffiti and that sometimes it would take weeks for defendant to remove it. He also claims that he was harassed by other employees because of his race and that other employees would vandalize his work equipment, but when reported, defendant never took action. Moye also alleges that he found nooses in his truck on two separate occasions. Defendant got involved by holding a meeting for the entire service center about their zero-tolerance policy. Defendant also initiated an investigation and required employees to watch videos as part of a re-education on the harassment and

discrimination policy. Moye also claims someone referred to an older person in an anti-harassment training video as "Dana Moye," and that a supervisor called him an "old fart."

In December 2015, Moye successfully drove one million miles without accident. Defendant usually rewards this milestone with a party, a plaque, a parking spot, and an embroidered jacket. Moye claims he never received the jacket. Defendant maintains that Moye received all of the benefits except for the jacket because the jacket was not completed before Moye's employment was terminated.

*Katina McGee*

McGee, an African-American female, was employed by defendant from November 8, 2013, until she was terminated on April 25, 2016. During the last year and four months of her employment, her job selection preference was for "ESL" runs—runs completed by two-person teams. In April 2016, one of the managers learned that one of the ESL drivers had concerns about teaming with McGee on an ESL run, if the situation presented itself, because his wife was uncomfortable with him going on an overnight trip with a female. The manager brought the issue up to Mahr, who then discussed the issue with Huner. Huner and Mahr concluded that the driver's concerns would not be accommodated and that the driver would have to work an ESL run with a female if a female was in line to fill that spot. According to Mahr, there were no other issues involving the matter after it was addressed. On April 14, 2016, McGee reported the issue to Mahr. Mahr told McGee she had already learned about and rectified the issue. McGee testified that after April 14, 2016, there were no further incidents in which employees refused to ride with McGee because she was a woman.

On April 20, 2016, McGee clocked into work and began working on the dock. Approximately two hours later, she clocked out and left work for the remainder of the night without notifying any supervisors. At approximately 7:00 am on April 21, 2016, McGee called Anita Sloan and claimed that she left work the night before because she had starting menstruating and had ruined her pants. McGee

claimed that she was too embarrassed to walk back out on to the dock, and so she waited in the bathroom for approximately 30 minutes hoping that someone would come by so that she could notify them. When she was unable to find a supervisor, she decided to leave. She did not inform anyone of the incident until she called Sloan the next morning. She claims she tried to call management immediately after she left work, but no one answered.

McGee spoke with Mahr and Service Center Manager Mike Lewis about the incident, and she sent Mahr a statement. She was placed out of service pending the results of an investigation. Mahr claims McGee's statement did not adequately explain why she did not call a supervisor or manager after she left the premises. She did note that McGee did not have any other discipline reports in her file. Mahr recommended termination for failure to adhere to Policy 541 due to her unauthorized absence from the workstation. On April 22, 2016, Kevin Huner authorized the termination. According to Mahr, other employees had been terminated for leaving work without permission, and she specifically recommended the termination of a white male DSR for leaving work without calling or notifying a supervisor.

McGee also claims that prior to her termination, she was subject to harassment by two male employees in the break room. One of the male employees made a comment about McGee preferring women. McGee claims she told Mahr about the incident; however, Mahr did not recall McGee ever complaining to her about harassing comments regarding her sexual orientation or race. McGee testified that after this comment, she did not experience any other sexually harassing incidents for the remainder of her employment.

Plaintiffs filed the present case on March 25, 2016, alleging race, age, and gender discrimination and harassment for the reasons stated above. Plaintiffs also alleged retaliation because they were all terminated near the time they made various reports about discrimination. Plaintiffs allege there was discrimination in defendant's dispatching system, and that they received less lucrative work assignments

because of their race, age, and gender. Plaintiffs also claim they were discriminated against in defendant's decisions to promote less senior Caucasian employees to positions for which plaintiffs were qualified.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" factual dispute requires more than a mere scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party demonstrates an absence of evidence in support of an element of the case, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The nonmoving party "may not rest upon the mere allegations or denials of his pleading." *Id.*

In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

## III.    Analysis

Plaintiffs Mann, Moye, and McGee all bring claims against defendant for violations of Title VII, alleging they were discriminated against based on race. Moye also argues he was discriminated against based on his age in violation of the ADEA. McGee argues she was also discriminated against based on

her gender and sex. All three plaintiffs also claim defendant engaged in a pattern and practice of race discrimination and harassment in violation of § 1981. All three plaintiffs also claim they were retaliated against based on their complaints of racial discrimination in violation of Title VII and § 1981. Moye claims he was retaliated against based on his complaints of age discrimination in violation of the ADEA and McGee claims she was retaliated against based on her complaints about gender and sex discrimination in violation of Title VII.

a. Employment Discrimination

Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In passing Title VII, Congress intended to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). Under the *McDonnell Douglas* burden-shifting framework, a Title VII plaintiff must first prove a prima facie case of discrimination. The Tenth Circuit has held that in cases such as these, a plaintiff must prove: (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000). Defendant concedes plaintiffs have made a prima facie case of discrimination with respect to their terminations.

Under *McDonnell Douglas*, the burden then shifts to the defendant to offer a facially nondiscriminatory reason for firing plaintiffs. *Id.* at 1230. This burden has been described by the Tenth Circuit as "exceedingly light." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011). The burden then shifts back to plaintiffs to "prove by a preponderance of the evidence that the legitimate

reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011). In determining whether the stated nondiscriminatory reasons for the termination were pretext, the court must "examine the facts as they appear *to the person making the decision*," rather than looking to "the plaintiff's subjective evaluation of the situation." *C.R. England*, 644 F.3d at 1044 (emphasis in original). To prove pretext, a plaintiff must show that the proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Bekkem v. Wilkie*, 915 F.3d 1258, 1268 (10th Cir. 2019). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Id.*

Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 459–60 (1975). Section 1981 provides a remedy against private employment discrimination that is "separate from and independent of the more elaborate and time-consuming procedures of Title VII." *Meade v. Merchants Fast Motorline, Inc.*, 820 F.2d 1124, 1126 (10th Cir. 1987). In racial discrimination cases, "the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

*Anthony Mann*

Defendant has conceded that Mann has made a prima facie case for discrimination under the *McDonnell Douglas* test. The burden therefore shifts to defendant to offer a nondiscriminatory reason for Mann's termination. Here, defendant maintains that Mann was terminated for policy violations including repeated use of his cell phone, for lying about having approved time off, and for not returning to work when instructed. Based on the evidence in the record, the court finds defendant met its burden.

The burden now shifts back to Mann to show, by a preponderance of the evidence, that defendant's nondiscriminatory reasons were pretext for discrimination. Mann offers the following evidence to prove defendant's stated reasons for termination were pretext: (1) similarly situated Caucasian DSRs were disciplined less severely for cell phone policy violations; (2) defendant claimed Mann was terminated for violating Policy 524, however, under Policy 524 cell phones are permitted during non-work time and Mann was already off duty when he was using his phone during the meeting with Mahr on May 14; (3) other similarly situated Caucasian DSRs were not suspended during investigations into employee complaints; (4) other similarly situated Caucasian DSRs have taken multiple unapproved days off work without being terminated; (5) Mahr did not have any evidence to support the conclusion that Mann had lied about having approved time off in June 2015; and (6) defendant's termination of Mann contradicted its attendance policy.

The Tenth Circuit believes that "it is not the duty of a court nor within the expertise of the courts to attempt to decide whether the business judgment of the employer was right or wrong. The court is not a super personnel department. All that a court does is to exercise a very limited review of the employment practices of any employer to see if the practices are shown to be lawful . . ." *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983). Considering this and the evidence in the record, the court does not believe that a jury could find that defendant's stated reasons for termination were pretext for discrimination. Defendant documented a series of events that, when viewed together, gave them reason to terminate Mann. In fact, when Huner first proposed termination to Moss, the Vice President for Human Resources, Moss recommended discipline instead of termination. It was only when Mahr and Huner believed that Mann was lying about approved time off that Moss finally approved the termination. Defendant was willing to give Mann a second chance only until he continued to violate company policy.

Mann, however, attempts to argue that other similarly situated Caucasian DSRs were not terminated for using their cell phones or taking unapproved time off. But Mann is unable to point to any specific incidents in which a Caucasian DSR violated the cell phone policy, answered his cell phone multiple times during a meeting with his supervisors, and lied about having paid time off, and was still not terminated. Mann argues that Mahr did not have an honest belief that he lied about having approved time off, but again the court must "examine the facts as they appear *to the person making the decision*," rather than looking to "the plaintiff's subjective evaluation of the situation." *C.R. England*, 644 F.3d at 1044 (emphasis in original). There is evidence in the record that Mahr and Huner investigated Mann's claims that he had requested time off and determined that he had never received approval for his request for that week.

The court finds Mann has not met his burden to show defendant's reasons for termination were pretext for discrimination. The court also finds there is no evidence in the record to support any claims that defendant discriminated against Mann in any employment actions involving job assignments and dispatch orders. Defendant maintains that the nature of the logistics and transportation business is unpredictable, and work duties may change depending on customer needs. Mann has not provided any evidence, beyond pure conjecture, that defendant intentionally discriminated against him because of his race by assigning lower compensated work assignments. This is also true as to any claims that Mann was not promoted because of his race. Mann claims he applied for a lead position that he was qualified for, but defendant gave the position to a younger, Caucasian DSR. Mann, however, has not provided any evidence of any open position that he was qualified for that was filled by a younger Caucasian DSR beyond just a generalized, conclusory allegation.

For these reasons, the court grants defendant's motion on Mann's claims for race discrimination under Title VII and § 1981.

*Dana Moye*

Again, defendant has conceded that Moye has made a prima facie case for discrimination under the *McDonnell Douglas* test. The burden therefore shifts to defendant to offer a nondiscriminatory reason for Moye's termination. Here, defendant does so by maintaining that Moye was terminated for driving company vehicles on a suspended license and failing to disclose the suspended license in accordance with its policies.

The burden now shifts back to Moye to show, by a preponderance of the evidence, that defendant's nondiscriminatory reasons were pretext for discrimination. Moye offers the following evidence to prove defendant's stated reasons for termination were pretext: (1) similarly situated Caucasian DSRs were not suspended or terminated for violating the same policy, (2) similarly situated Caucasian DSRs were never asked to disclose their suspensions after defendant discovered they had driven company vehicles while suspended, and these DSRs were allowed to work on the dock until their license was reinstated; and (3) Moye did not, in fact, falsify documents because he was not required to disclose his license suspension on the form at issue.

The court has reviewed the evidence in the record and does not find Moye has met his burden to show defendant's stated reasons for termination were pretext. The evidence in the record shows that defendant had a policy that all DSRs were required to hold a valid CDL and were required to report any tickets or license suspensions immediately after the event and also on the annual review form. Moye's evidence to show pretext is insufficient. He tries to say the policy at issue was no longer in place because it was originally a policy of the former owner, Con-way. He provides no evidence that this policy was no longer in effect. He further tries to establish defendant changed its termination theory during litigation by initially terminating him under Policy 541, and now arguing he was terminated under Policy 811. The name of the policy is irrelevant. Defendant has not changed its position that Moye was terminated

for driving on a suspended license and not reporting the suspension either immediately after the event or on the annual review. And further, Moye claims the annual review form at issue listed dates in 2016 and so he did not know he had to report his 2015 suspension. Defendant admits this is a typographical error but notes that it was clear on other portions of the form that the reporting period was for the previous 12 months. And regardless, Moye never reported the suspension at any time, which is a violation of defendant's policies.

Moye also claims younger, Caucasian DSRs were not suspended or terminated for violating Policy 541 or committing the same offense. To the extent Moye also brings an age discrimination claim under the ADEA, the court will evaluate those claims under the same *McDonnell Douglas* test. *Rivera v. City & Cnty. Of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). Considering both Moye's age and race claims, the court still does not find he has made a showing that defendant's stated reasons for termination were pretextual. Although he claims younger, Caucasian DSRs were not suspended or terminated for violating policy 541, Moye has not provided any evidence beyond this generalized accusation. Considering that "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment," *Bekkem*, 915 F.3d at 1268, the court does not find Moye's allegations to be enough to survive summary judgment.

The court also finds there is no evidence in the record to support any claims that defendant discriminated against Moye in any employment actions involving job assignments and dispatch orders. Moye also claims that he was next in line to be promoted to Day Time Line Hall after another DSR retired, but it was filled by a Caucasian DSR. There is evidence in the record, however, that disputes Moye's claims. According to Mahr, and supporting documentation, the retiring DSR had a daytime line haul run to Tulsa. When this DSR retired, Moye's preference sheet showed that he ranked the day time line haul run to Tulsa as his last choice out of 21 available runs. According to Mahr, it was therefore

unlikely he would be slotted for that run based on his own preferences. The court therefore grants

defendant's motion as to Moye's claims of discrimination under Title VII, § 1981, and the ADEA.

*Katina McGee*

Again, defendant has conceded that McGee has made a prima facie case for discrimination under

the *McDonnell Douglas* test.[1] The burden therefore shifts to defendant to offer a nondiscriminatory

reason for McGee's termination. Here, defendant maintains that McGee was terminated for leaving

work without notifying a supervisor.

The burden now shifts back to McGee to show, by a preponderance of the evidence, that

defendant's nondiscriminatory reasons were pretext for discrimination. McGee offers the following

evidence to prove defendant's stated reasons for termination were pretext: (1) similarly situated

Caucasians and male DSRs were able to violate Policy 541 without being terminated; (2) African

American DSRs were terminated at a higher rate than Caucasian DSRs for violations of the same

policies; and (3) she did not, in fact, violate Policy 541 because it was customary for Linehall Drivers to

leave work without authorization when they did not have a run scheduled.

As mentioned above, McGee was terminated for an unauthorized absence from her workstation

after she clocked out of work without notifying her supervisors. McGee claims she left work due to an

emergency and that she attempted to notify her supervisors but was unable to reach anyone. Again, in

determining whether the stated nondiscriminatory reasons for the termination were pretext, the court

must "examine the facts as they appear *to the person making the decision*," rather than looking to "the

plaintiff's subjective evaluation of the situation." *C.R. England*, 644 F.3d at 1044 (emphasis in original).

Here, it is uncontested that McGee clocked out of work after two hours without notifying a supervisor.

This conduct violated defendant's policies, and defendant had the right to make whatever disciplinary

---

[1] To the extent McGee claims gender discrimination, the court still applies the same *McDonnell Douglas* test. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).

decision it deemed appropriate for that conduct. It is not the duty of the court to decide if this was a fair business judgment by defendant. The court must only evaluate the evidence to determine whether McGee's termination was unlawful. The court, however, does not find sufficient evidence in the record that shows defendant's stated nondiscriminatory reasons for terminating McGee were merely pretext for discrimination. McGee admits to the conduct for which she was terminated. She has not provided any evidence—beyond conclusory allegations—that she did not violate any company policy or that other similarly situated Caucasian males were not disciplined as severely. In fact, Mahr testified that she recommended termination for a Caucasian male DSR who clocked out of work after five minutes and left without telling any supervisors.

McGee also alleges she was the victim of gender discrimination during her employment due to an incident when a male DSR requested not to be paired with a female when performing an ESL run because of his wife's discomfort with him sleeping near another female. It is uncontroverted that Mahr was aware of the incident and informed the male DSR that his request would not be accommodated. McGee admitted that there were no other instances after discussing the issue with Mahr. McGee also failed to produce any evidence of other occurrences when she was "bumped from a run" because of her gender.

McGee has failed to make the showing that defendant's stated reasons for her termination were pretext for discrimination. The court grants defendant's motion on McGee's claims of race and gender discrimination under Title VII.

The court would also note that evidence in the record shows that defendant's Human Resource department conducted an investigation after Mann made allegations of race discrimination. According to the evidence in the record, Human Resource representatives interviewed 128 employees of different races. The interviews revealed that many employees believed there was favoritism with whatever group

they were not a part of. Kevin Huner, Human Resources Director, determined that defendant had issues with consistently applying policies across the board, and recommended training to address the consistency issues. All three plaintiffs have alleged that they were treated differently than other Caucasian/male/younger employees but have not provided any nonconclusory evidence to prove there was discriminatory treatment against their protected class. The court finds plaintiffs have not made a showing that defendant's nondiscriminatory termination reasons were pretext for discrimination and grants defendant's motion for summary judgment on any race/age/gender discrimination claims.

   b.  Hostile Work Environment Harassment

Although not specifically mentioned in the statute, it is "well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to [Title VII]." *Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir. 1994). A plaintiff in a race discrimination claim must establish that "(1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Id.* For harassment to be pervasive or severe, the plaintiff must "show more than a few isolated incidents of racial enmity," and, "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.* An employer "who does not actively engage in harassment may be liable under agency principles." *Id.* at 551. The employer is liable on a negligence theory if it "knew or should have known about the conduct and failed to stop it." *Benavides v. City of Okla. City*, 508 F. App'x 720, 723 (10th Cir. 2013). Therefore, "[a]n employer is absolved of liability for acts of harassment by its employees if it undertakes remedial and preventative action reasonably calculated to end the harassment." *Id.* (citing *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1310 (10th Cir.2005)).

Plaintiffs' claims for work environment harassment generally involve defendant's alleged discriminatory enforcement of policies and customs, failure to investigate complaints of racism, and

refusal to recognize seniority. Specifically, Mann claims that in 2013 or 2014 he witnessed an employee telling a black supervisor, "I'll whip your ass, boy." He also claims that in 2013 or 2014 he saw something like "KKK" written on his locker and that sometime in 2014 he heard monkey noises over the radio while he was working. Moye specifically alleges that he witnessed racist graffiti on lockers, was called racial slurs, did not receive his "Million Mile" jacket, and was frequently addressed as "old" or "old fart" by supervisors. McGee specifically claims that she was subjected to comments like "you people," and one occasion of harassment by two male employees in the break room.

In their response to defendant's motion, plaintiffs' claims for harassment focus mainly on humiliation they experienced due to disparate treatment because of their race/age/gender. These matters are issues of employment discrimination, and plaintiff has not cited any authority to show this conduct constitutes actionable hostile work environment claims.

As for plaintiffs' specific allegations about harassment based on racial slurs or other comments, the court recognizes the inappropriate nature of such comments and does not seek to minimize or condone that behavior. However, the court finds these isolated instances do not rise to the level required to prove work environment harassment. A successful claim requires "pervasive or severe" harassment—not sporadic slurs or comments. Plaintiffs generally assert that their complaints were not investigated, but when asked directly about specific instances, plaintiffs conceded that when the issues were reported, defendant addressed them.

The court finds plaintiffs have failed to present evidence that rises to the level of actionable work environment harassment. For these reasons, the court grants defendant's motion for summary judgment on claims of harassment in violation of Title VII or § 1981.

      c. Retaliation

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by Title VII." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008). A plaintiff alleging retaliation based on complaints of discrimination must prove his case using the same *McDonnell Douglas* framework set out above. *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). To establish a prima facie case of retaliation, a plaintiff must show "(1) he or she engaged in a protected activity, (2) he or she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (1whitney0th Cir. 2015). "The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for taking the adverse employment action before ultimately shifting back to the plaintiff to establish that the employer's explanation is pretextual—i.e., unworthy of belief." *Id.*

Plaintiffs claim they were terminated in retaliation for making discrimination complaints to defendant. Mann submitted a complaint alleging racial discrimination on May 29, 2015. An investigation into the complaint concluded on June 8, 2015 and Mann was terminated on June 15, 2015. Moye utilized defendant's Open Door Policy to report age and race discrimination based on the incident in which he was disciplined for inconsistencies on his report after he was asked to turn around during a run in order to return keys to another DSR. Moye reported this alleged discrimination in January 2016 and he was terminated on April 7, 2016. McGee reported race and gender discrimination to Mahr on April 14, 2016 and April 19, 2016 and was terminated on April 22, 2016. Plaintiffs all argue that they have established a causal connection between their reports and their terminations based on temporal proximity alone.

To establish a prima facie case of retaliation, plaintiffs must prove a causal connection between the protected activity—making a report of discrimination—and the termination, by "produc[ing]

evidence from which one can infer that the [employer] would not have taken the adverse action if plaintiff[s] had not engaged in protected activity." *McDonald v. City of Wichita*, 156 F. Supp. 3d 1279, 1302 (D. Kan. 2016). Causal connection can be shown "with evidence that justifies an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Id.* However, "where very close temporal proximity between the protected activity and the retaliatory conduct is lacking . . . plaintiff must offer additional evidence to establish causation." *Id.*

Here, plaintiffs may have shown that they were terminated in close temporal proximity to when they submitted their discrimination complaints; however, they have provided no other evidence that they were terminated because of the discrimination complaints. Even if the court considered temporal proximity alone as a causal connection, plaintiffs have not shown any evidence that defendant's nondiscriminatory reasons for termination were pretext for retaliation. For the reasons discussed above, defendant provided sufficient nondiscriminatory reasons for all three plaintiffs' terminations. In their response to defendant's summary judgment motion, plaintiffs submit the same arguments for why defendant's reasons were pretextual. The court again finds that plaintiff failed to produce any evidence that would prove, by a preponderance of the evidence, that defendant's reasons were pretextual.

For these reasons, the court grants defendant's motion on plaintiffs' retaliation claims.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 202) is granted.

This case is closed. The clerk of the court is directed to enter judgment in favor of defendant and against plaintiffs.

Dated March 29, 2019, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**